## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WINSTON & STRAWN LLP, | Civil Action No. 18-cv-11430 |
| Plaintiff, | **COMPLAINT** |
| - against - | |
| MID-ATLANTIC ARENA, LLC, and ESG ENTERPRISES, INC. | |
| Defendants. | |

Plaintiff Winston & Strawn LLP ("Winston"), appearing *pro se*, brings this action for breach of contract (as a third party beneficiary), unjust enrichment, and tortious interference with contract, and alleges as follows on the basis of personal knowledge or, where it does not have such knowledge, on information and belief:

### OVERVIEW OF THE ACTION

1.      This case arises from an aborted development project in Virginia Beach, Virginia. In 2015, Mid-Atlantic Arena, LLC ("MAA") and the City of Virginia Beach ("the City") entered into a development contract, pursuant to which MAA agreed to develop, construct, and manage a new sports and entertainment complex within City limits.

2.      MAA secured financing for the project though a private loan arranged and administered by JPMorgan Chase Bank, N.A. ("JPMorgan").  As part of that transaction, MAA entered into a credit agreement (the "Credit Agreement") with JPMorgan and Sumitomo Mitsui Banking Corporation ("SMBC").  The Credit Agreement expressly and unambiguously required

MAA to "promptly" pay JPMorgan's legal fees upon written demand for same, regardless of whether the project was completed.  In January 2017, JPMorgan retained Winston to represent it in its capacity as the arranger and administrative agent of the loan.  Over the course of the following year, Winston attorneys devoted almost a thousand hours to the project, bringing the loan to a successful close.

3.      At the eleventh hour, while the ink on the Credit Agreement was still wet, the City suddenly and inexplicably pulled out of the project.  Thereafter, Winston reminded MAA of its payment obligations under the Credit Agreement, and MAA acknowledged those obligations.  But when Winston sent MAA a written invoice for its services, MAA did not pay its fees, "promptly" or otherwise.  To the contrary, MAA refused to pay what it owes, instead informing Winston that it would only satisfy its obligations if and when MAA achieved a successful outcome in its recently-filed lawsuit against the City.   Needless to say, the Credit Agreement makes no allowances for any such contingency, and MAA is thus liable for breach of contract.

4.      Moreover, one of MAA's corporate affiliates, ESG Enterprises, Inc. ("ESG"), has interfered with Winston's ability to recover its fees from MAA.  ESG, which controls MAA, and whose President and CEO is also the President of MAA, has caused MAA not to honor its commitments under the Credit Agreement.

5.      Winston has made repeated good faith efforts to amicably resolve this matter, without success.  Indeed, despite being entitled to "prompt" payment, Winston gave MAA more than ten months to satisfy its obligations before initiating this lawsuit.  MAA has rebuffed those efforts at every turn.

## PARTIES

6.     Plaintiff Winston is, and at all relevant times was, a limited liability partnership with its principal place of business in Chicago, Illinois.

7.     Winston is a law firm that is engaged in the practice of law in locations throughout the United States and internationally.  One of Winston's offices is located at 200 Park Avenue, New York, NY 10166.

8.     Defendant MAA is a limited liability company organized and existing under the laws of Delaware, with its principal office located at 3333-24 Virginia Beach Boulevard, Virginia Beach, VA 23452.

9.     Defendant ESG, doing business as "The ESG Companies," is a corporation organized and existing under the laws of Virginia, with its principal office also located at 3333-24 Virginia Beach Boulevard, Virginia Beach, VA 23452.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a) as the amount in controversy exceeds seventy-five thousand dollars ($75,000) and the parties have diversity of citizenship.

11.     This Court has personal jurisdiction over MAA by virtue of its consent to this Court's jurisdiction under the Credit Agreement.[1]

12.     This Court has personal jurisdiction over ESG by virtue of its tortious acts outside the state causing injury to a person or property within the state under N.Y. C.P.L.R. § 302(a)(3)(ii). Upon information and belief, ESG expected or should have reasonably expected its acts to have consequences in the state because both Winston and JPMorgan have offices in New York and the

---

[1] *See* Ex. A (Credit Agreement, dated Nov. 7, 2017), at Section 9.09(b).

lawyers and bankers involved in the project are based here.  Personal jurisdiction also exists because ESG derives substantial revenue from interstate commerce.  For example, despite its Virginia domicile, ESG has developed several real estate projects outside the state, including in Connecticut, Florida and the Carolinas.[2]

13.     In the alternative, this Court has personal jurisdiction over ESG because MAA consented to the Court's jurisdiction in the Credit Agreement and MAA is ESG's alter ego.

14.     Venue is proper in this District by virtue of MAA's consent to same in the Credit Agreement.[3]  Additionally, venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the actions and wrongful conduct underlying these claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.     The Arena Project

15.     In 2012, the City of Virginia Beach, Virginia began soliciting proposals for the development and construction of a new sports and entertainment arena within the City limits (the "Arena").

16.     On or about February 17, 2014, MAA submitted a proposal to the City to develop, construct, and operate the Arena, which the City later approved.

17.     On or about December 11, 2015, the City and MAA entered into a Development Agreement setting forth the parties' respective rights and obligations.

18.     The Development Agreement required MAA to obtain a private loan of approximately one-hundred and seventy million dollars ($170,000,000) to finance the construction

---

[2] *See Our Projects*, THE ESG COMPANIES, http://www.esgco.com/our-projects/ (last visited Oct. 30, 2018).

[3] *See* Ex. A (Credit Agreement, dated Nov. 7, 2017), at Section 9.09(b)–(c).

and development of the Arena.  The Development Agreement also required MAA to commit at least forty million dollars ($40,000,000) in equity to the project, such equity to be obtained from private sources.

19.     MAA secured the required financing through a credit facility (the "Facility") arranged and administered by JPMorgan.

20.     In or around January 2017, JPMorgan retained Winston to represent it in connection with its responsibilities as the arranger and administrative agent of the Facility.

**B.     The Credit Agreement Requires MAA to Pay Winston's Fees**

21.     On March 8, 2017, MAA and JPMorgan signed a commitment letter, under which JPMorgan and SMBC agreed to commit a total of one-hundred and fifty million dollars ($150,000,000) to the Facility.

22.     In return, MAA agreed, *inter alia*, to pay any and all legal fees, disbursements and expenses incurred by JPMorgan, the arranger and administrative agent of the Facility, including those incurred in connection with preparing, executing and administering loan documents and administering the Facility.

23.     On November 7, 2017, the parties closed on the loan.  Under the terms of the accompanying Credit Agreement, executed the same day, JPMorgan and SMBC agreed to commit a total of one-hundred and sixty-seven million dollars ($167,000,000) to the Facility (the "Loan").

24.     Like the commitment letter, the Credit Agreement makes clear that MAA is required to pay JPMorgan's legal fees and expenses:

> *The Borrower shall pay (i) all reasonable fees, charges and disbursements of counsel for the Administrative Agent, the Arranger, any Bookrunner, the Accounts Bank and their Affiliates* in connection with the structuring and arrangement of the credit facilities provided for herein and any credit or similar facility refinancing or replacing, in whole or in part, any of the credit facilities provided for herein, including the preparation, execution and delivery of the Commitment Letter, as well

as the preparation, execution, delivery and administration of this Agreement, the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (*whether or not the transactions contemplated hereby or thereby shall be consummated*), and (ii) all out-of-pocket expenses incurred by the Administrative Agent, the Arranger, any Bookrunner, the Accounts Bank or any Lender, including the fees, charges and disbursements of any counsel for any of the foregoing, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or incurred in connection with the liquidation of the Collateral.[4]

25.      The Credit Agreement also requires MAA to pay JPMorgan's legal fees "promptly" upon receipt of a written demand: "All amounts due under this Section shall be payable promptly after written demand therefor."[5]

C.      **Winston's Representation of JPMorgan**

26.      Winston began to represent JPMorgan in this matter and to perform legal work on its behalf in or around January 2017.

27.      Winston performed a significant amount of work for JPMorgan in connection with JPMorgan's activities as the arranger and administrative agent of the Facility, including, among other things: (i) drafting the commitment letter and Credit Agreement; (ii) drafting several ancillary documents related to the transaction, including the pledge and security agreement, subordination agreement, environmental liability agreement, completion guaranty agreement, and support agreement; (iii) negotiating the terms of the same agreements with counsel for MAA;  (iv) due diligence review of numerous project contracts; and (v) work on deliverables related to the closing.

---

[4] *See* Ex. A, at Section 9.03(a) (emphasis added).

[5] *See id.* at Section 9.03(e).

28.     Winston ably and competently performed these services for JPMorgan with the expectation that MAA would honor the terms of Credit Agreement and pay Winston's fees.

29.     Winston dutifully recorded the services it provided to JPMorgan and the expenses incurred on its behalf.

30.     All told, Winston attorneys billed nearly one thousand hours on this matter.

31.     Winston's fees and expenses for work it performed representing JPMorgan total $833,790.30 (the "Unpaid Legal Fees and Expenses").

**D.     The Arena Project Collapses, and MAA Reneges on its Obligations**

32.     On November 7, 2017, the date upon which the Loan was scheduled to close, the City council voted 9-to-1 to terminate its Development Agreement with MAA unless MAA closed the Loan by 11:59 p.m. that day.

33.     The Loan closed several hours before that 11:59 p.m. deadline, and JP Morgan confirmed as much to the City shortly thereafter.  Nevertheless, on November 8, the City formally noticed its termination of the Development Agreement and refused to continue performing its obligations thereunder.

34.     Specifically, the City refused to execute and deliver certain documents due upon the closing of the Loan.  In addition, the City failed to convey the land on which MAA was to build the Arena, as it had agreed to do under the Development Agreement.

35.     While Plaintiff takes no position with respect to the propriety or legality of the City's actions, they effectively doomed the Arena project.

36.     On January 16, 2018, MAA filed a complaint in state court in Virginia Beach, alleging that the City had wrongfully terminated and breached the Development Agreement and

seeking more than one-hundred and forty million dollars ($140,000,000) in damages from the City.[6]

37.     MAA alleges in that complaint that, although the City terminated the Development Agreement, "JPMorgan . . . formally closed the [] Loan on November 7, 2017 and posted the loan on its books."[7]  Accordingly, MAA has admitted that the Credit Agreement—and its requirement that MAA pay Winston's fees—remains in full force and effect.

38.      However, the Credit Agreement makes clear that even if the Loan had not closed, MAA's payment obligations would survive.  Indeed, it explicitly provides that MAA must pay JPMorgan's legal fees "whether or not the transactions contemplated hereby or thereby shall be consummated."[8]  The commitment letter says the same thing: that MAA's duty to compensate and reimburse Winston for its legal fees shall persist regardless of whether final documentation is ever executed.

39.     Defendants understood and acknowledged MAA's continuing obligations to Winston.  Before the Loan closed, a Winston partner wrote in an email to Andrea Kilmer, the president and CEO of ESG: "As I am sure you understand . . . if for some reason the transaction does not move forward, we [Winston] would still need to be paid for all the work performed through that date."  Ms. Kilmer replied: "We understand."[9]  Representatives of MAA recognized its obligation to pay Winston in subsequent conversations with employees of JPMorgan and others.

---

[6] *See Mid-Atlantic Arena, LLC v. City of Virginia Beach*, Civil Action No. CL18-81 (Va. Cir. Ct. Jan. 16, 2018) ("Complaint").

[7] *See id.* ¶ 49.

[8] *See* Ex. A, at Section 9.03(a).

[9] *See* Ex. B (Email thread between A. Hoffman and A. Kilmer, dated Nov. 6, 2017).

40.    On January 18, 2018, Winston made a written demand, in the form of an invoice addressed to MAA, for the Unpaid Legal Fees and Expenses.[10]

41.    Rather than promptly pay the invoice, which it was required to do under the clear terms of the Credit Agreement, MAA reneged on its obligations to Winston.  On several occasions, Defendants communicated their position that MAA would not satisfy its obligation to pay its Unpaid Legal Fees and Expenses unless and until MAA recovered damages from or settled its lawsuit with the City.

42.    While convenient from the perspective of MAA, which has alleged that it has experienced financial difficulty relating to the demise of the Arena project,[11] Defendant's position has no basis in the Credit Agreement, which makes clear that (a) any legal fees should be paid "promptly," without regard for any pending litigation, and (b) those fees are to be paid by MAA, not the City.

43.    Using JPMorgan as an intermediary, Winston contacted MAA and urged it to reconsider.  Representatives of MAA praised Winston's legal work and stated that, while they wished to see Winston compensated in full, ESG had prevented that from happening until and unless MAA won its lawsuit against the City.

44.    On October 31, 2018, Winston sent a final demand letter to MAA, setting forth the provisions of the Credit Agreement requiring MAA to cover the Unpaid Legal Fees and Expenses.  MAA again acknowledged its obligation and desire to pay Winston's fees, and again refused to pay them.  Having reached an impasse, Winston filed this Complaint.

---

[10] See Ex. C (Winston invoice, dated Jan. 18, 2018).

[11] See Complaint, supra at n.6, ¶ 47 (alleging that the termination "caused several of [MAA's] equity partners to demand and receive refunds of their equity contributions" and "suite lessees to request refunds of their premium seating deposits").

E.       **MAA and ESG Are Alter Egos**

45.      On information and belief, MAA is an alter ego of ESG.

46.      MAA is a special purpose vehicle, organized for the sole purpose of developing the Arena.

47.      Upon information and belief, MAA operates as a mere façade of ESG.

48.      MAA is owned by a holding company in which ESG Arena, LLC, an affiliate of ESG's, controls a majority (87.5%) ownership interest.

49.      Under the terms of the Credit Agreement, MAA was to be managed by an entity named AIM, LLC.  AIM, LLC is owned and controlled by ESG and its founder, Virginia developer Edward S. Garcia.[12]

50.      Indeed, press reports identify Mr. Garcia and ESG as the prime movers behind the Arena project, noting that "ESG, led by Virginia Beach developer Eddie Garcia, planted the idea of partnering to build an iconic sports and entertainment venue" and describing ESG as the "project manager[.]"[13]

51.      Upon information and belief, ESG has failed to observe corporate formalities with respect to MAA.  Defendants share office space in Virginia Beach, list the same registered agent in Virginia, and have overlapping employees and officers.[14]  For example, ESG's Chief Financial Officer, Valerie Wilkinson, also serves as the CFO of MAA.  And Ms. Kilmer, who signed the Credit Agreement on MAA's behalf, is ESG's president and CEO.  Even as they conducted MAA

---

[12] *See* Ex. A (Credit Agreement, dated Nov. 7, 2017), at Schedule 3.11 ("Ownership").

[13] Jared Council, *AND THEN THERE WERE TWO How The ESG Cos. $200 million arena proposal came together*, PILOTONLINE (Feb. 18, 2014), https://pilotonline.com/inside-business/news/commercial-real-estate/article_5472a3ce-33d4-5f50-8388-7c13a8d6c784.html (last visited Nov. 1, 2018).

[14] *See* Ex. D (Virginia Secretary of State filings).

business, Wilkinson, Kilmer, and others held themselves out as ESG employees by using "@esgco.com" email addresses and ESG signature blocks.

52.     Upon information and belief, MAA is currently insolvent or approaching insolvency.  MAA's complaint against the City paints a dire picture of its financial circumstances: since the City terminated the Development Agreement, MAA has been forced to refund equity pledges and seating deposits and has paid over fifteen million dollars ($15,000,000) in expenses, development, and financing costs for the Arena.  Moreover, MAA alleges it has lost income from the sale of naming rights and sponsorships, a ten million dollar ($10,000,000) development fee, and future profits of more than one-hundred and forty million dollars ($140,000,000).[15]

53.     Indeed, although MAA may have been adequately capitalized to conduct the Arena transaction had it been consummated, it was insufficiently capitalized to compensate its professionals, including Winston, in the event that transaction fell through (as it ultimately did). In addition to the above, that undercapitalization is evident from, *inter alia*, MAA's statements to Winston representatives that it has not been able to fulfill its out-of-pocket obligations under Section 9.03(a) of the Credit Agreement to several entities, including Winston, because it lacks the resources with which to do so.  In fact, MAA's lawsuit against the City is being bankrolled by ESG because MAA lacks sufficient funds with which to prosecute that lawsuit itself.

54.     Accordingly, the observance of the fiction of MAA's corporate existence separate from its alter ego ESG would promote injustice and cause harm to Winston.

---

[15] *See* Complaint, *supra*, at n.6, ¶¶ 47, 50, 64.

## FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS

### (Breach of the Credit Agreement – Third Party Beneficiary)

55.     Winston incorporates by reference the allegations stated in the above paragraphs as if stated fully herein.

56.     The Credit Agreement is a valid, enforceable contract between MAA, JPMorgan, and SMBC.

57.     Winston was an intended beneficiary of this contract because the Credit Agreement explicitly states that "[t]he Borrower," here MAA, "shall pay [] all reasonable fees, charges and disbursements of counsel for the Administrative Agent [or] the Arranger," in this case, Winston.

58.     The Credit Agreement further requires MAA to pay these fees "promptly" upon receipt of a written demand.

59.     Winston provided MAA with a written demand for its relevant fees, charges and disbursements on January 18, 2018.

60.     MAA has materially breached the Credit Agreement by failing to promptly pay Winston the Unpaid Legal Fees and Expenses.

61.     By reason of MAA's material breach of the Credit Agreement, Winston has suffered damages in the amount of the Unpaid Legal Fees and Expenses, plus the value of the fees, charges and disbursements it is incurring in prosecuting this action.

62.     Further, in the event MAA does not have resources sufficient to satisfy a judgment obtained against it in this action, the circumstances of this case justify piercing MAA's corporate veil to hold its alter ego ESG liable for the damages suffered by Winston.

## SECOND CAUSE OF ACTION IN THE ALTERNATIVE AGAINST ALL DEFENDANTS

### (Unjust Enrichment)

63.     Winston incorporates by reference the allegations stated in the paragraphs 1 through 54 as if stated fully herein.

64.     The services provided by Winston conferred a benefit on MAA by, among other things, facilitating the arrangement and administration of the Facility and permitting the Loan to close, a condition of MAA's agreement with the City.

65.     Winston performed these services with the expectation that it would be compensated by MAA and relied on, *inter alia*, MAA's representations to that effect in the commitment letter, Credit Agreement, and Ms. Kilmer's pre-closing email to Winston.

66.     MAA had knowledge of the benefit that Winston conferred upon it.

67.     MAA has not provided Winston with compensation for that benefit.

68.     Accordingly, MAA has been unjustly enriched at Winston's expense, and its retention of this benefit without compensating Winston would be inequitable.

69.     By reason of MAA's inequitable conduct, Winston has suffered damages in the amount of the Unpaid Legal Fees and Expenses, plus the value of the fees, charges and disbursements it is incurring in prosecuting this action.

70.     Further, in the event MAA does not have resources sufficient to satisfy a judgment obtained against it in this action, the circumstances of this case justify piercing MAA's corporate veil to hold its alter ego ESG liable for the damages suffered by Winston.

## THIRD CAUSE OF ACTION AGAINST ESG

### (Tortious Interference with Contract)

71.     Winston incorporates by reference the allegations stated in the above paragraphs, except for paragraphs 45 through 54, 62 and 70, as if stated fully herein.

72.     The Credit Agreement is a valid, enforceable contract between MAA, JPMorgan and SMBC.

73.     Winston was an intended beneficiary of the Credit Agreement, and as such may bring a claim for tortious interference with that contract under New York law.

74.     ESG had knowledge of the Credit Agreement, as evidenced by the fact that ESG's president and CEO signed the Credit Agreement on behalf of MAA.

75.     MAA materially breached the Credit Agreement by failing to promptly pay Winston the Unpaid Legal Fees and Expenses.

76.     ESG intentionally induced MAA to breach the Credit Agreement by, among other things, intentionally ensuring that MAA not pay Winston the Unpaid Legal Fees and Expenses.

77.     MAA, which compensated other professionals for work done in connection with the Arena transaction, expressed a willingness to pay the Unpaid Legal Fees and Expenses and, on information and belief, could have done so but for the activities of ESG.

78.     ESG used wrongful means, including the exertion of economic pressure on MAA, to induce MAA to breach the Credit Agreement.

79.     By reason of ESG's interference with the Credit Agreement, Winston has suffered damages in the amount of the Unpaid Legal Fees and Expenses, plus the value of the fees, charges and disbursements it is incurring in prosecuting this action.

## JURY DEMAND

Winston demands a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Winston respectfully requests that the Court enter judgment against Defendants as follows:

A.     On the first cause of action for breach of contract, award Winston appropriate damages from Defendants of $833,790.30, plus consequential damages and statutory or other interest;

B.     On the second cause of action in the alternative for unjust enrichment, award Winston restitution from Defendants in the amount of $833,790.30;

C.     On the third cause of action for tortious interference with contract, award Winston appropriate damages from ESG of $833,790.30, plus consequential damages and statutory or other interest;

D.     Award Winston the expenses, including attorneys' fees, costs and disbursements, incurred in prosecuting this action, to which it has both a contractual and equitable right; and

E.     Award Winston such other and further relief as this Court finds just and equitable.

Respectfully Submitted,

Dated:      New York, NY            WINSTON & STRAWN LLP
            December 6, 2018

                                   By: s/ George E. Mastoris_____
                                       GEORGE E. MASTORIS
                                       IAN T. HAMPTON
                                       *Winston & Strawn LLP*
                                       *200 Park Avenue*
                                       *New York, New York 10166*
                                       *(212) 294-6700*
                                       *gmastoris@winston.com*
                                       *ihampton@winston.com*