UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────────────────────

WINSTON & STRAWN LLP,

                Plaintiff,

   -against-

                                                   No. 18-cv-11430 (CM)

MID-ATLANTIC ARENA, LLC,
ESG ENTERPRISES, INC.,

                Defendants

───────────────────────────────────────────────

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS**

McMahon, J.

      Plaintiff Winston & Strawn, LLP is suing defendants Mid-Atlantic Arena, LLC, and its alleged corporate parent ESG Enterprises, Inc. for $833,790.30 in unpaid legal fees. Neither of the defendants was Winston's client, and Winston did not perform legal services on behalf of the defendants. Instead, Winston performed services for JPMorgan Chase, a bank that helped Mid-Atlantic secure a loan for developing an arena on the Virginia Beach waterfront. As part of the credit agreement between Mid-Atlantic and JPMorgan, Mid-Atlantic agreed to pay "all reasonable fees, charges and disbursements of counsel for" JPMorgan.

      The development plans for the arena later fell through, and Winston was never paid. Winston has now filed suit, not against JPMorgan, but against Mid-Atlantic and ESG, alleging claims for breach of contract and unjust enrichment against each of them. Winston also alleges a third claim for tortious interference with contract solely against ESG.

      Mid-Atlantic and ESG have moved to dismiss all claims against them. Their motions are granted.

1

## I. BACKGROUND

### A. The Parties

Plaintiff Winston & Strawn, LLP is a law firm. It is a limited liability partnership with its principal place of business in Chicago, Illinois. Winston has several offices throughout the United States and abroad, one of which is located in New York City.

Defendant Mid-Atlantic Arena, LLC ("MAA") is a limited liability company organized under the laws of Delaware. Its principal place of business is in Virginia Beach, Virginia.

Defendant ESG, doing business as "The ESG Companies" is a Virginia corporation, also with its principal place of business in Virginia Beach. ESG and MAA have the same corporate address.

According to Winston, ESG's President and CEO is also the President of MAA, and MAA is owned by a holding company in which ESG Arena, LLC – an affiliate of ESG – controls a majority (87.5%) ownership interest. (Compl. at ¶¶ 4, 48). Winston alleges that ESG is the alter ego of MAA.

By filing their motions to dismiss in this district without raising any objection to jurisdiction, defendants have consented to personal jurisdiction. *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 133 (2d Cir. 2011).

### B. The Virginia Beach Arena

The facts are recounted from Winston's complaint or details otherwise available for judicial notice.[1]

---

[1] Some of the information recounted below is taken from the Virginia Supreme Court's opinion deciding MAA's breach-of-contract suit against the City of Virginia Beach. *Mid-Atlantic Arena, LLC v. City of Virginia Beach*, No. 191020, 2020 WL 2780000 (Va. May 28, 2020). These details are referenced by citing to the case. Courts may take judicial notice of pleadings and decisions in other cases without converting a motion to dismiss to one for summary judgment. *See, e.g., Ndremizara v. Swiss Re America Holding Corp.*, 93 F. Supp. 3d 301, 313 (S.D.N.Y. 2015).

This dispute stems from now-scrapped plans to build and develop an 18,000-seat arena in Virginia Beach. In 2012, the City began soliciting proposals for the development of the arena, and MAA submitted a winning proposal in early 2014. (Compl. at ¶¶ 15–16). MAA and the City entered into a Development Agreement on December 11, 2015. That agreement required MAA to obtain a private loan of approximately $170 million to finance the construction of the arena. (Compl. at ¶ 18). Per the Development Agreement, the City retained the right to approve MAA's loan commitment; indeed, the City's participation in the project was conditioned on its approving the final form for all of the construction loan documents before the loan closed. *See Mid-Atlantic Arena, LLC v. City of Virginia Beach*, No. 191020, 2020 WL 2780000 (Va. May 28, 2020).

MAA engaged with JPMorgan Chase and Sumitomo Mitsui Banking Corp. ("SMBC") to secure financing. MAA and JPMorgan signed a commitment letter for the Credit Agreement on March 8, 2017, pursuant to which JPMorgan and SBMC agreed to lend $150 million toward the Arena's development costs. (Compl. at ¶ 21). Per the complaint (and I accept this allegation as true, although the commitment letter is not attached to the pleading) MAA agreed to pay, *inter alia*, all legal fees incurred by the banks in preparation for the Credit Agreement.

MAA, JPMorgan, and SMBC ultimately executed the Credit Agreement (which appears to have superseded the commitment letter) on November 7, 2017. The final, executed version of the Agreement committed JPMorgan and SMBC to lend a total of $167 million for the Arena project. It also included a provision requiring the "Borrower" – defined in the Credit Agreement as MAA – to pay "all reasonable fees, charges and disbursements of counsel for [the Banks]." (Compl. at ¶ 24). It is this Credit Agreement – to which Winston is not a party[2] – that Winston accuses the defendants of breaching.

---

[2] Defendant ESG is also not a party to the Credit Agreement. Winston seeks to hold it liable on an alter ego theory of liability. (Compl. at ¶¶ 45–54).

3

Winston began representing JPMorgan for the purpose of preparing the Credit Agreement and other related loan documents in January 2017. Winston was not hired by MAA or ESG, and it did not perform any legal work for MAA or ESG. In its capacity as JPMorgan's counsel, Winston drafted the commitment letter and Credit Agreement, drafted several ancillary documents related to the transaction, negotiated the terms of these agreements, and conducted due diligence in connection with these documents. Winston billed MAA nearly one thousand hours in its representation of JPMorgan in the Virginia Beach Arena matter, and the fees and expenses for the work performed totaled $833,790.30. (Compl. at ¶ 30–31).

The deal ultimately fell through. The City did not approve the loan documents MAA submitted and backed out of the project. *See Mid-Atlantic Arena*, 2020 WL 2780000, at *2.

MAA subsequently sued the City for breach of the Development Agreement. After a trial, the Virginia court found that the City had not breached the Development Agreement, a ruling that the Virginia Supreme Court affirmed. *Id*. at *5. This action was stayed while the Virginia lawsuit proceeded; once it was finally resolved, the stay was lifted, and the defendants moved to dismiss Winston's complaint.

### C. The Credit Agreement

The only provision of that Agreement that Winston accuses MAA and ESG of breaching is Section 9.03(a). It states in full:

> Expenses; Indemnity; Damage Waiver. (a) The Borrower shall pay (i) all reasonable fees, charges and disbursements of counsel for the Administrative Agent, the Arranger, any Bookrunner, the Accounts Bank and their Affiliates in connection with the structuring and arrangement of the credit facilities provided for herein and any credit or similar facility refinancing or replacing, in whole or in part, any of the credit facilities provided for herein, including the preparation, execution and delivery of the Commitment Letter, as well as the preparation, execution, delivery and administration of this Agreement, the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), and

(ii) all out-of-pocket expenses incurred by the Administrative Agent, the Arranger, any Bookrunner, the Accounts Bank or any Lender, including the fees, charges and disbursements of any counsel for any of the foregoing, in connection with the enforcement or protection of its rights in connection with the Loan Documents, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans or incurred in connection with the liquidation of the Collateral.

The Agreement defines JPMorgan as the "Administrative Agent," "Arranger," and "Accounts Bank" and both JPMorgan and SMBC as "Bookrunner." The "Borrower" is MAA. (Credit Agreement, Art. I).

Another subsection of Section 9.03 provides that "All amounts due under this Section shall be payable promptly after written demand therefor." (Credit Agreement, Section 9.03(e)).

Section 9.04 further states:

Successors and Assigns. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted thereby, except that . . . (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Arranger, any Bookrunner, the Accounts Bank and, to the extent expressly contemplated hereby, the sub-agents of the Administrative Agent and the Related Parties of any of the Administrative Agent, the Arranger, any Bookrunner, the Accounts Bank and any Lender) any legal or equitable right, remedy or claim under or by reason of this Agreement.

Finally, Section 9.09 provides that the Agreement is governed by New York law.

Winston is not a party to the Credit Agreement. The name "Winston" does not appear on the document at all, with the sole exception that it is to be copied on notices sent to JPMorgan. (Credit Agreement at § 9.01(a)(ii)). No representative from Winston signed the Agreement in any capacity.

5

Nevertheless, Winston argues that it is an intended third-party beneficiary of the Credit Agreement, and that MAA owes Winston $833,790.30 for the fees Winston charged in connection with its work for JPMorgan in the Arena matter. According to Winston, ESG is liable for the payment of its fees as MAA's alter ego, or, in the alternative, because it induced MAA to breach its contractual obligation to pay Winston's fees.

## II. DISCUSSION

### A. Standard for a Rule 12(b)(6) Motion to Dismiss

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, a plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2007)). A motion to dismiss will be denied if the plaintiff's allegations are plausible – "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid*.

Courts may consider any written instrument (such as a contract or an agreement) that is attached to the complaint or is otherwise incorporated by reference to determine whether the complaint's allegations are plausible. When construing such documents – in this case the Credit Agreement – a court is "not obliged to accept the allegations of the complaint as to how to construe such documents, but . . . should resolve any contractual ambiguities in favor of the plaintiff." *Subaru Distributors Corp. v. Subaru of America, Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).

### B. Breach of Contract (Count I)

Defendants move to dismiss Count I, Winston's breach-of-contract claim, on the basis that Winston does not have standing to sue because it was not a party to the agreement and was not an intended beneficiary of the contract.

Under New York law, non-parties can sue for breach only if they are an intended beneficiary of the contract. Those who qualify as mere incidental beneficiaries have no standing to sue on the contract. "A third party may sue as a beneficiary on a contract made for its benefit. However, an intent to benefit the third party must be shown, and, absent such intent, the third party is merely an incidental beneficiary with no right to enforce the particular contracts." *Dormitory Auth. v. Samson Constr. Co.*, 30 N.Y.3d 704, 710 (2018) (cleaned up). Intent is key; the contract must evince a clear intent by the signing parties to confer a right to sue on the contract to the non-party, and the intention to confer intended third-party beneficiary status "must appear from the four corners of the instrument." *City R Grp. Holdings LLC v. Foresite Realty Mgmt., LLC*, No. 17-cv-7850 (RJS), 2019 WL 1437519, at *4 (S.D.N.Y. Mar. 29, 2019) (citation omitted).

Winston claims that it is an intended third-party beneficiary under the Credit Agreement. It is not.

When construing a contract to see whether someone is an intended third-party beneficiary with a right of enforcement under the contract, a court looks first to see whether the contract so provides. Section 9.04[3] of the Credit Agreement identifies the parties who could arguably qualify as intended third-party beneficiaries with the ability to sue under the contract. It provides, in pertinent part (emphasis added):

> (ii) . . . *Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person* (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Arranger, any Bookrunner, the Accounts Bank *and, to the extent expressly contemplated hereby*, the sub-agents of the Administrative Agent and *the Related Parties of any of the Administrative Agent*, the Arranger, any Bookrunner, the Accounts Bank and any Lender) *any legal or equitable right, remedy or claim under or by reason of this Agreement*.

---

[3] MAA did not point to Section 9.04 as a reason to dismiss the breach-of-contract claim until its reply. Generally, a court will not consider a new argument raised in a reply brief; but this is not an instance in which a "new argument" has been made. The court is simply interpreting the Credit Agreement, which was attached as an exhibit to Winston's complaint, and which must be interpreted to understand Winston's claims.

This list of parties who are expressly designated as having legal and equitable rights and the ability to assert claims under or by reason of the Credit Agreement does not include "Winston & Strawn" or "counsel/attorneys for the Administrative Agent." Winston was not a "Participant" in the deal or a sub-agent (an agent of an agent) of any of the participants in the deal. And while the term "Related Parties," is defined in Article I of the agreement to include "advisors" of any specified Person – a term that, for purposes of this motion, must be construed in favor of the plaintiff, and that arguably includes JPMorgan's attorneys – Section 9.04 states that such persons are intended beneficiaries only "to the extent expressly contemplated hereby," and not generally.

So, the question becomes: Is there anything in the contract that "expressly contemplates" that Winston, as a Related Party, can bring a claim against MAA for payment of the fees it incurred in representing JPMorgan? The answer is no. There is no such provision. There is no indication anywhere in the Credit Agreement that Winston was either to receive payment directly from MAA or that it had any right to sue MAA for payment.

There is certainly nothing in the Credit Agreement to indicate that MAA obligated itself to pay Winston's fees directly. Section 9.03(a) states that MAA is obliged to "pay (i) all reasonable fees, charges and disbursements *of* counsel for [JPMorgan]." It does not say that MAA must pay "all reasonable fees, charges and disbursements *to* counsel for [JPMorgan]."

Quite the contrary: another provision of the contract specifically indicates that JPMorgan was to receive payment from the "Borrower" (MAA) for its counsel fees. Section 4.01(e) of the contract, which sets forth the Effective Date of the Agreement, states (emphasis added):

> This Agreement shall not become effective until the date on which each of the following conditions shall be satisfied . . . (e) *The Administrative Agent [JPMorgan] shall have received all fees and other amounts due and payable* on or prior to the Effective Date, including, to the extent invoiced, payment or reimbursement of all fees and expenses (*including fees, charges and disbursements*

8

*of counsel*) required to be paid and reimbursed by the Borrower under the Commitment Letter, the Fee Letter (or to the extent the Fee Letter requires such payment on the Effective Date) or any Loan Document and set forth in the construction loan closing disbursement statement.

The only inference that can be drawn from reading Sections 9.03(a) and 4.01(e) together is that MAA was obligated to pay *JPMorgan* for the latter's legal fees. If MAA did not pay JPMorgan, then the Credit Agreement would not become effective. Rather than falling into the category of persons "expressly provided hereby" as a Related Party who could sue on the contract, these provisions demonstrate the exact opposite. Since Section 9.04 provides that no party other than those listed had any enforceable rights under the contract, Winston cannot be found to be an intended beneficiary of the Credit Agreement, and its direct action against MAA for breach of contract must be dismissed.

Even if there were any ambiguity about whether Winston could sue as a Related Party (and there is none), Winston's breach of contract claim against MAA would have to be dismissed because it is not the *only* party that could sue for relief – which, under New York law, is the defining characteristic of an intended, as opposed to an incidental, third-party beneficiary.

The New York Court of Appeals has "sanctioned a third party's right to enforce a contract in two situations: when the third party is the only one who could recover for the breach of contract or when it is otherwise clear from the language of the contract that there was 'an intent to permit enforcement by the third party.' " *Dormitory Auth.*, 30 N.Y.3d at 710. (quoting *Fourth Ocean Putnam Corp. v. Interstate Wrecking Co.*, 66 N.Y.2d 38, 45 (1985)).

Winston is not an intended third-party beneficiary because it is not the "only one" that could sue to recover attorneys' fees. JPMorgan, a party to the contract, and the party to which payment of counsel fees is guaranteed, could do so. The right to have attorneys' fees covered by MAA runs to JPMorgan, and no one else. As noted above, nothing in the Credit Agreement

9

guaranteed that MAA would pay anything directly to Winston, and Section 9.03(a)(i) guaranteed JPMorgan payment of the counsel it incurred in the preparation of the Credit Agreement and other deal documents "whether or not the transactions contemplated hereby or thereby shall be consummated." Since Winston cannot point to any agreement between it and MAA that contemplates direct payment from MAA to Winston, there is no reason to conclude that the arrangement contemplated by the Credit Agreement differs from what occurs in the ordinary course: a client retains counsel and is responsible to that counsel for the payment of fees; but the client – which is a party to the Credit Agreement – has the right to collect those fees from MAA.

Winston is of course an indirect beneficiary of that agreement. But as long as JPMorgan – a party to the contract with rights thereunder – can sue to force MAA to pay it for Winston's fees, Winston is not an intended third-party beneficiary as a matter of law. "Courts have found that third-party status may be established where *only* the third party may recover if the promisor breaches the contract; conversely, if another besides the third party may recover, beneficiary status is negated." *United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd.*, 988 F. Supp. 367, 373 (S.D.N.Y. 1997) (summarizing cases) (emphasis added).

Winston contends that Section 9.03(a) obligates MAA to pay Winston directly because Section 9.03(a)(i) is worded differently from Section 9.03(a)(ii). Subsection (ii) obligates MAA to pay "all out-of-pocket expenses incurred by the Administrative Agent. . . including the fees, charges and disbursements of any counsel . . . in connection with the enforcement or protection of its rights in connection with the Loan Documents . . . or in connection with the loans made hereunder." Winston argues that the use of the phrase "out-of-pocket expenses" in subsection (ii) means that JPMorgan must first pay its attorneys and then obtain reimbursement from MAA if it has to sue to enforce its rights under the various Loan Agreements. Since subsection (i) does not

use the phrase "out-of-pocket," Winston argues that it contemplates (albeit *sub silentio)* that MAA will pay Winston directly.

But the difference between the two provisions does not indicate that Winston is an intended third-party beneficiary as that term is understood under New York law. Subsection 9.03(a)(i) governs the payment of attorney fees that JPM incurred in structuring and closing the deal. By its terms it neither obligates MAA to pay Winston directly nor bars it from doing so. But the right to have its counsel fees paid by someone other than itself runs to *JPMorgan*, not to Winston; and it is unquestionably the case that JPMorgan could sue MAA for failing to cover that cost. That precludes Winston from bringing suit on the contract as an intended third-party beneficiary under New York law. The fact that subsection (ii) compels JPMorgan to bear its own legal fees in the first instance if it is required to sue to enforce its rights – if, for example, JPMorgan were forced to sue MAA in order to "enforce[] or protect[] . . . its right[]" under subsection (i) to have MAA foot Winston's legal bills – is entirely beside the point.[4]

If there were any doubt on this score, it is dispelled by Section 4.01(e) of the Credit Agreement, which provides that the Agreement will not become effective until "The Administrative Agent [JPMorgan] shall have received all fees" it was owed under the agreement, "including fees, charges and disbursements of counsel." Any ambiguity in Section 9.03(a) about what party is entitled to receive payment from MAA for attorney's fees is cleared up by this section, which expressly states that the Credit Agreement's coming into force is contingent on

---

[4] The difference between the payment of counsel fees incurred in connection with litigation – where, except in matters prosecuted on contingency, counsel tend to bill and pay periodically during the pendency of the lawsuit – and the payment of counsel fees incurred in connection with the preparation of deal documents – where the lawyers get paid at the end, when the deal either closes or falls apart – makes the difference in the wording of subsection 9.03(a)(i) and (a)(ii) perfectly understandable.

*JPMorgan's* receiving payment. And to circle back to the beginning, that means that nothing in the Credit Agreement expressly confers any right of action under the Agreement on Winston.

In sum, the Credit Agreement neither expressly indicates that Winston is an intended third-party beneficiary with a right of action under the agreement, nor suggests that Winston – and only Winston – can sue to recover its attorney's fees in an action for breach of the Credit Agreement.

This case is distinguishable from the one on which Winston relies in attempting to establish that it is an intended beneficiary. In *ExpertConnect, LLC v. Fowler*, No. 18-cv-4828 (LGS), 2020 WL 3961004 (S.D.N.Y. July 13, 2020), ExpertConnect and Fowler – a former employee of the company – entered into a separation agreement which contained a "Mutual Nondisparagement" provision. ExpertConnect agreed to "cause its senior management not to issue, authorize or condone any disparaging comments or statements about [the former employee] in any manner likely to be harmful to [her] or [her] business, professional or personal reputation." *Id*. at *1. Fowler later started her own business, Stratfluence, and Stratfluence filed claims against ExpertConnect after it found out that ExpertConnect had sent several emails to its prospective clients implying that Fowler was involved in the theft of trade secrets.

My colleague, the Honorable Lorna Schofield, held that Stratfluence – which was not party to the Separation Agreement – could sue ExpertConnect for breach because there was "express language in the agreement stating the parties' intention to benefit a third party." *Id*. at *5. Although the company did not yet exist at the time the agreement was executed, the contract's language "reflects the parties' mutual understanding that Fowler would transition from ExpertConnect to a new business or employment, which neither party could identify by name at the time they executed the agreement, but which was clearly contemplated and turned out to be Strafluence." *Id*. at *6. In

other words, the contract was clearly made for the benefit of Fowler's new business, demonstrating a clear intent to permit that new business to enforce the non-disparagement agreement.

The Credit Agreement between MAA and JPMorgan is nothing like the contract between ExpertConnect and Fowler. There is no provision in the Credit Agreement that suggests that the contract was made specifically to benefit Winston. The provision was made to the benefit of JPMorgan. MAA's agreement with JPMorgan also contained an express provision prohibiting any third-party from having any legal rights or claims based on the contract – a provision that apparently was not part of the ExpertConnect agreement.

Accordingly, because no reasonable construction of the Credit Agreement permits an inference that Winston was an intended beneficiary of the Agreement, Winston' breach-of-contract claim against MAA is dismissed.

As for its claim against ESG: ESG also not a party to the contract and is sued in Count I only as MAA's purported alter ego. But if MAA is not liable to Winston, then ESG cannot possibly be liable. Therefore, it cannot breach the contract and its motion to dismiss is granted as well.

### C. Unjust Enrichment (Count II)

Under New York law, to state a claim for unjust enrichment, a plaintiff must plausibly allege "that (1) the other party was enriched, (2) at that party's expense, and (3) that 'it is against equity and good conscience to permit [the other party] to retain what is sought to be recovered.' " *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 182 (2011) (citation omitted). Unjust-enrichment claims sound in quasi-contract, and "courts may infer the existence of an implied contract to prevent one person from unjustly enriching himself at the other party's expense." *Piccoli A/S v. Calvin Klein Jeanswear Co.*, 19 F. Supp. 2d 157, 166 n.61 (S.D.N.Y. 1998) (citation omitted). However:

> As reflected in the common law of various states, to recover under a theory of quasi contract, a plaintiff must demonstrate that services were performed for the defendant resulting in its unjust enrichment. It is not enough that the defendant received a benefit from the activities of the plaintiff; *if services were performed at the behest of someone other than the defendant, the plaintiff must look to that person for recovery.*

*Id.* at 166–67 (quoting *Kagan v. K-Tel Ent., Inc.*, 568 N.Y.S.2d 756, 757 (N.Y. 1st App. Div. 1991)) (emphasis added).

Winston's claim for unjust enrichment must be dismissed because it has not plausibly alleged that it conferred any type of "benefit" on MAA or ESG. Winston was not counsel to either of those entities and did not perform any legal services for them. In fact, Winston was *adverse* to MAA during the negotiations over the Credit Agreement. Winston represented JPMorgan, the lender. MAA was the Borrower and was represented by another law firm. The interests of the two sides were not necessarily aligned; JPMorgan and MAA negotiated the Credit Agreement at arm's length, meaning they were on opposing sides of the negotiating table. The legal work that Winston performed was done for JPMorgan and JPMorgan alone, not MAA. In short, Winston's services were all "performed at the behest of someone other than [MAA]." *Id.* at 167. That means Winston must look to that "someone" for recovery, not MAA, for whom it did no work.

Fundamentally, unjust-enrichment claims exist " 'to prevent injustice, in the absence of an actual agreement between the parties concerned,' " and "a claim will not be supported unless there is a connection or relationship between the parties that could have caused reliance or inducement on the plaintiff's part." *Georgia Malone & Co., Inc. v. Ralph Rieder*, 926 N.Y.S.2d 494, 497 (N.Y. 1st App. Div. 2011) (quoting *Mandarin Trading*, 16 N.Y.3d at 182)).

Here, Winston has not pled any allegations that plausibly suggest it was "induced" to confer a benefit on MAA and that it would be unjust to deny Winston relief. Winston states that it was responsible for "drafting the commitment letter and Credit Agreement" (Compl. at ¶ 27), meaning

14

that it clearly would have known about the provision providing that "Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto . . . ) any legal or equitable right, remedy or claim under or by reason of this Agreement." (Credit Agreement, Section 9.04). Winston also would have had notice of other provisions, such as the one providing that the Effective Date would not pass until "*The Administrative Agent* [JPMorgan] . . . received all fees and other amounts due and payable . . . (including fees, charges and disbursements of counsel) *required to be paid and reimbursed by the Borrower*." (Credit Agreement, Section 4.01(e) (emphasis added)). There are no facts that indicate Winston was "induced" into conferring an otherwise unjust benefit upon MAA.

Because Winston's claim for unjust enrichment against MAA is dismissed, its alter ego claim against ESG is dismissed as well.

### D. Tortious Interference with Contract (Count III)

Winston's claim for tortious interference with contract is filed only against ESG. This claim is dismissed because there was nothing between Winston and MAA with which ESG could interfere.

Under New York law, a litigant's ability to sue for tortious interference with a contract to which it was not a party requires that the litigant be an intended third-party beneficiary. It is the same standard for judging whether a non-party has standing to sue for breach of contract. *See SageGroupAssociates, Inc. v. Dominion Textile (USA), Inc.*, 665 N.Y.S.2d 407, 408 (N.Y. 1st App. Div. 1997) ("The broker's cause of action against the landlord for tortious interference with contract was properly dismissed on the ground that the broker was neither a party to nor an intended beneficiary of the sublease rejected by the landlord."); *Scheckter v. Emigrant Sav. Bank*, 654 N.Y.S.2d 162, 163 (N.Y. 2d App. Div. 1997) (holding that a plaintiff could not sue for tortious

interference with contract because "The parties to the agreement did not intend that the benefit of the agreement flow to the plaintiff").

The only argument Winston makes in opposing ESG's motion to dismiss is to assert that it is an intended third-party beneficiary of the Credit Agreement. It has been conclusively established that Winston was not an intended third-party beneficiary of the Credit Agreement. So its claim against ESG for tortious interference with contract is not viable. Count III is dismissed.

### III. CONCLUSION

The motions of MAA and ESG are granted and the complaint is dismissed. This dismissal is of course without prejudice to JPMorgan's ability to sue to recover any attorney's fees that it pays to Winston.

The Clerk of Court is respectfully directed to remove the motion at Docket Number 30 from the Court's list of open motions.

Dated: July 19, 2021

United States District Judge

BY ECF TO ALL COUNSEL